**CENTRAL TABLET MANUFACTURING COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 69–116.**

United States District Court,
S. D. Ohio, E. D.

March 17, 1972.

Larry H. Snyder, Columbus, Ohio, for plaintiff.

Stephen Csontos, Department of Justice, Tax Division, Washington, D. C., for defendant.

## OPINION AND ORDER

CARL B. RUBIN, District Judge.

This action, brought pursuant to Title 28 U.S.C. § 1346(a) (1) to recover taxes alleged to have been erroneously collected, comes before the Court for final decision on the stipulations of fact, exhibits, and briefs of the parties.

The uncontested facts in this case are as follows: Plaintiff, Central Tablet Manufacturing Company (hereinafter Central Tablet) was for many years prior to May 14, 1966, an Ohio corporation engaged in the manufacture and sale of writing tablets, school supplies, art materials and related items at its place of business in Columbus, Ohio. On August 13, 1965, a majority of Central Tablet's production and maintenance employees went on strike, thereby reducing production to approximately 5% of normal volume. On September 10, 1965, during the course of this strike, an accidental fire largely destroyed Central Tablet's equipment, machinery and building, none of which was subsequently repaired or replaced. The strike was never settled and Central Tablet never again engaged in manufacturing.

As of September 10, 1965, the plaintiff carried fire and extended coverage insurance on its buildings, machinery and inventory. It also carried business interruption insurance. The stated dollar limit of liability on the building was $225,000 under three separate policies of $75,000, which were identical except for the insurer. The stated dollar limit of liability on the machinery and inventory was $450,000 under one policy, The stated dollar limit of liability for business interruption was $100,000 under two policies identical except for the insurer.

Negotiation of Central Tablet's claim for business interruption loss began on approximately October 8, 1965. Disputes arose between Central Tablet and its insurers as to the estimated period of loss to be covered by business interruption insurance and as to the probable duration of the strike had there not been a fire, for the purpose of determining the "actual loss sustained" by Central Tablet during the period of loss covered under the insurance policies. No settlement on this claim was negotiated until August 25, 1967, and on or about September 22, 1967, Central Tablet received $67,000 in payment of its loss.

Negotiations of Central Tablet's insurance claims for building, machinery

and personal property losses began on approximately November 1, 1965. Dispute arose regarding the applicability of a co-insurance clause contained in the building insurance policy, the extent of building loss, the value of the building at the time of the loss, the value of the machinery and equipment that was lost or damaged and the cost of repair of repairable machinery and equipment. Central Tablet accepted a settlement of its building insurance claim on approximately May 20, 1966, and on June 15, 1966, received $174,595.05 in payment thereof. On approximately August 25, 1966, Central Tablet accepted a settlement of its personal property claim and on or about November 17, 1966, received $104,609.27 in payment thereof.

On May 14, 1966, before the corporation had settled any of its claims or received any insurance funds, the shareholders of Central Tablet held a special meeting pursuant to notice, elected to dissolve the corporation and adopted a plan of dissolution and complete liquidation. A certified copy of the Resolution of Stockholders and Plan of Dissolution (see Exhibit 4) was filed with the Cincinnati District Director of Internal Revenue on May 25, 1966. On May 3, 1967, all remaining assets, after liquidating distributions to shareholders, were conveyed to the Ohio National Bank of Columbus, Ohio, in trust for the shareholders pending the complete winding-up of the corporation's affairs, including the payment of taxes and the collection of its insurance and other claims.

## I

## THE APPLICABILITY OF SECTION 337

 The primary question presented for decision is whether the plaintiff's gain from the involuntary conversion of its building, machinery and inventory is exempt from taxation by reason of Section 337(a) of the 1954 Internal Revenue Code, 26 U.S.C. § 337(a).[1] The District Director, electing not to follow the decision of the Eighth Circuit Court of Appeals in United States v. Morton, 387 F.2d 441 (1968), concluded that such gain was taxable and assessed deficiencies against plaintiff in the amount of $70,051.30 for its tax year ending on October 31, 1965, and $11,930.30 for its 1963 tax year.[2] We conclude that the

---

1. § 337. *Gain or loss on sales or exchanges in connection with certain liquidations*

 (a) General rule.—If—

 (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

 (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

2. Such assessment was based upon the inclusion by the District Director of the following sums received by plaintiff from fire and business interruption insurance:

 1. *Taxpayer's 1967 tax year*

 (a) $223,669.00 (the excess of fire insurance proceeds over net book value, plus $4000.00 in legal fees, assigned as a cost of the sale) received after the adoption of a complete plan of liquidation and distributed within a 12-month period following the date of adoption, in accordance with Section 337. This sum was treated by the Director as a long-term capital gain in the year ending October 31, 1965.

 (b) $12,992.00, representing the pro-rata part of $67,000.00 business interruption insurance proceeds which accrued to it in the year ending on October 31, 1967.

 (c) $20,764.00, representing that part of the total proceeds from fire insurance to be treated as ordinary income resulting from depreciation, within the meaning of Section 1245, Internal Revenue Code of 1954. For a discussion of this assessment, see Part II of this opinion, *infra*.

assessments made by the Director were erroneous in part, and we therefore grant partial judgment for the plaintiff.

■ The primary object of Section 337 of the Internal Revenue Code was remedial. First, the section intended to eliminate double taxation on the same gain, resulting when a corporation decides to liquidate and thereafter distributes its assets to shareholders themselves subject to taxation. See, United States v. Morton, *supra*; Pridemark, Inc. v. C. I. R., 345 F.2d 35 (4th Cir. 1965); West Street-Erie Boulevard Corp. v. United States, 411 F.2d 738 (2d Cir. 1969). Second, the section was promulgated to resolve the conflict created by disparate holdings in Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1944) and United States v. Cumberland Public Service Co., 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 (1950), and to eliminate technical distinctions based upon the form of corporate dissolution created by these cases. See, United States v. Morton, *supra*, 387 F.2d at 444. The thrust of Section 337 is thus to create a rule of exemption which is understandable and easy to apply.

Difficulties of application have arisen, however, as a result of the Court of Claims' holding in Towanda Textiles v. United States, 180 F.Supp. 373, 149 Ct. Cl. 123 (1960), a case which established the principle that an involuntary conversion of corporate assets by accidental fire constitutes a "sale or exchange" of property, within the meaning and purpose of Section 337(a). The question which has been raised is this: At what point of time, for tax purposes, should such sale or exchange be deemed to take place? At the time of the involuntary conversion itself? At the time the taxpayer receives proceeds from the conversion? Or at the time that the right to receive proceeds becomes fixed and determinable? The Court in *Towanda Textiles* was not faced with this precise question, since in that case both the fire itself and the realization of proceeds from fire insurance occurred after a plan of liquidation had been adopted and within the 12-month period contemplated by the statute.

The precise question was raised and adjudicated in Morton v. United States, 258 F.Supp. 922 (W.D.Missouri 1966), the Missouri court holding:

"In order to carry out the clear intent of Congress in enacting § 337, that an involuntary conversion *followed by* adoption of a plan of complete liquidation by a corporation and the completion thereof within 12 months of its adoption, likewise comes within the intent of Congress when it exempted the corporation from liability for a tax on the gain derived from a sale on its property in liquidation."

In a lengthy and well-reasoned opinion, this holding was sustained by a unanimous Court in United States v. Morton, 387 F.2d 441 (8th Cir. 1968). The Court rejected as unpersuasive the Government's argument that conversion by fire is similar for tax purposes to a conversion by condemnation, where, depending on State law, the simple filing of a condemnation proceeding may give rise to a taxable gain to the condemnee. See, e. g., Covered Wagon, Inc. v. Commissioner of Internal Revenue, 369 F.2d 629 (8th Cir. 1966); Wendell v. Commissioner of Internal Revenue, 326 F.2d 600 (2d Cir. 1964). Unlike condemnation, the Court concluded, where a con-

2. *Taxpayer's 1963 Tax Year*
 (a) $54,008.00, representing the prorata portion of the $67,000.00 proceeds from business interruption insurance which accrued to plaintiff in its 1966 tax year (resulting in a decrease in plaintiff's operating loss carryback to 1963).

 (b) The disallowance as an expense in the year ending October 31, 1966, of legal fees in the amount of $4000.00, paid by plaintiff during that year for services rendered in the negotiation and adjustment of the insurance losses.

clusive, constitutional right to compensation is vested in the condemnee on the date of the taking, a fire:

> "is but the commencement of an involuntary conversion that does not come into fruition until, at least, the amount to be received by way of reimbursement for that loss is decided either by agreement or by court action
>
> . . .
>
> "The mere conversion of a tangible capital asset into a chose in action against an insurance company for an undetermined amount is not a completed 'sale or exchange.' Collection is predicated upon compliance with policy conditions, which uniformly require a proof of loss and the allowance of a period of time within which the insurance company may make its investigation before suit may be properly instituted. It would thus appear that the 'sale or exchange' by involuntary conversion is not completed until either the policy proceeds are received, or an enforceable settlement of a determined amount is agreed upon or a court judgment obtained. There certainly can be no gain to recognize until the amount of the proceeds is determined and made available. . . . Therefore, any gain resulting from the collection of the insurance proceeds would be entitled to nonrecognition under § 337." 387 F.2d at 447, 448.

The Court concludes that the reasoning and conclusions of *Morton* are persuasive. We adhere to its holding.

The Government asserts, however, that *Morton* is distinguishable from the present case, inasmuch as the claimant there was a cash basis taxpayer whereas the plaintiff here utilizes an accrual method of accounting. In addition, the Government has attempted to show, by way of deposition, that the fact of liability was never put in issue by taxpayer's insurance adjusters, although the amount of liability was subject to negotiation. Thus, the argument goes, this taxpayer's right to receive insurance proceeds became fixed before its plan of corporate liquidation was adopted; that is, at the time of the fire, or as soon thereafter as it became apparent that the insurers' basic liability was not to be contested.

On its surface and applied to the facts of this case, this argument lacks plausibility. In general, under the accrual method of accounting, it is the right to receive income, and not the actual receipt thereof which gives rise to taxation. Income is realized by an accrual basis taxpayer when his right to receive it becomes fixed and its measure does not depend on future events or contingencies, even though the exact amount may not be determined until later. See, Cappel House Furnishing Co. v. United States, 140 F.Supp. 92 (S.D.Ohio 1956), aff'd. 244 F.2d 525 (6th Cir. 1957); Ohmer Register Co. v. Commissioner of Internal Revenue, 131 F.2d 682, 686 (6th Cir. 1942). See also, Continental Tie and Lumber Co. v. United States, 286 U.S. 290, 52 S.Ct. 529, 76 L.Ed. 1111 (1932).

In insurance accrual cases, it has been held that the right to proceeds does not become fixed until there is an unqualified recognition of liability by the obligor. See, generally, 2 Mertens, Law of Federal Income Taxation, § 12.61 (1967 Rev.); Maryland Shipbuilding and Drydock Co. v. United States, 409 F.2d 1363, 187 Ct.Cl. 523 (1969). Furthermore, the amount to be received must be susceptible to calculation; i. e., the taxpayer must have on its own books and accounts some data by which he can reasonably estimate the *quantum* of the sum to be received, if it is to give rise to taxable income. See Continental Tie & Lumber Co., *supra*, 286 U.S. at 296, 52 S.Ct. 529; Cappel House Furnishing Co., *supra*, 244 F.2d at 530. As *Cappel House* recognizes, the vice to be prevented is the forestalling or avoidance of taxation through the simple device of delaying computation of income, the right to which has become fixed and

which is reasonably estimable. *Id*, at 530.

The facts of the present matter, taken as a whole, distinguish it from *Cappel House, supra*. At no time was an express admission of liability made by taxpayer's insurance adjusters. Indeed, there is some evidence in the record that the insurance companies denied that notice of claim was properly given by plaintiff. And even if it were possible to conclude that liability was at some point impliedly admitted, there is insufficient evidence in the record to determine at what point in time such admission occurred.

Negotiations between plaintiff and agents of the insurance companies took place over an extended period of almost two years. Involved in these negotiations were three separate insurance contracts, at least two of which were exceedingly complex and difficult to apply under the circumstances of the case. Disputes occurred over such matters as the applicable period of coverage, the projected length of the strike, and the repairability and valuation of damaged machinery. In one instance, with regard to plaintiff's property insurance claim, questions arose as to the applicability of a co-insurance clause, which if found to be applicable, would have reduced plaintiff's coverage by 43%.[3] In each case, substantial discrepancies existed between the initial offers made by the insurance companies, the maximum permissible insurance coverage, and the amounts ultimately negotiated. And, although dollar amounts were finally (and somewhat arbitrarily) agreed upon, the parties were evidently unable to resolve many of their differences in interpreting the scope of coverage.

Under all of the above circumstances, it would be an utter fiction for us to conclude that the taxpayer realized fixed and estimable income before it adopted a plan of liquidation on May 14, 1966. While there are instances in which double taxation may result from the operation of law, it is not the considered policy of this Court to seek out situations in which to impose a double tax. Accordingly, the Court holds that Central Tablet was entitled to Section 337 nonrecognition of gains realized from insurance proceeds and is entitled to a refund of taxes thereon which have been erroneously collected.

## II

### *The Section 1245 Income*

Pursuant to Section 1245 of the Internal Revenue Code,[4] 26 U.S.C. § 1245, the District Director assessed a tax on $20,764.00 of property and building insurance proceeds, representing ordinary income received by taxpayer from the recapture of depreciation. The parties are in agreement that Section 1245 overrides the nonrecognition provisions of Section 337 and have stipulated

---

3. It has been held, even where the amount of insurance loss has been fully adjusted, that accrual of insurance proceeds is not required until the insurer has formally waived co-insurance requirements affecting part of the claim. See, 2 Mertens, Law of Federal Income Taxation, § 1265, at p. 236.

4. § 1245. *Gain from dispositions of certain depreciable property*

(a) General rule.—

(1) Ordinary income.—Except as otherwise provided in this section, if section 1245 property is disposed of during a taxable year beginning after December 31, 1962, the amount by which the lower of—

(A) the recomputed basis of the property, or

(B) (i) in the case of a sale, exchange, or involuntary conversion, the amount realized, or

(ii) in the case of any other disposition, the fair market value of such property, exceeds the adjusted basis of such property shall be treated as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231. *Such gain shall be recognized notwithstanding any other provision of this subtitle.* [emphasis added]

that the above amount is subject to taxation. The only question presented is whether such proceeds were taxable in plaintiff's 1965 tax year, as assessed by the District Director, or in plaintiff's 1966 tax year, as contended by the plaintiff.

For reasons fully and adequately stated in Part I of this Opinion, the Court holds that plaintiff's gain from the involuntary conversion of Section 1245 property did not accrue until it settled its claim in 1966 and received monies in payment of building and property losses. Accordingly, plaintiff is entitled to a refund of the tax assessed in 1965.

### III

*Legal Fees as a Capital Expenditure*

Central Tablet took as an ordinary income deduction for tax years 1966 and 1967, $4,000.00 for legal fees attributable to negotiations and settlement of the insurance loss. It used its 1966 deduction to increase its operating loss carryback for the 1963 tax year. See note 2, *supra.* The District Director disallowed these deductions, treated them as capital expenditures, and assessed deficiencies against the taxpayer. Since plaintiff now concedes that the District Director's assessment was correct, we find it unnecessary to consider this question. But see, Lanrao, Inc. v. United States, 288 F.Supp. 464 (E.D. Tenn.1968), aff'd. per curiam, 422 F.2d 481 (6th Cir. 1970).

Wherefore, it is the finding of this Court that deficiency assessments entered by the Internal Revenue Service against the plaintiff were erroneous as a matter of law and that plaintiff is entitled to a refund for its 1963 and 1965 tax years. Judgment is hereby entered in plaintiff's behalf for $81,981.60, less an amount representing the tax difference between ordinary income deduction and the capital expenditure deduction on $8,000.00.

It is so ordered.